**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Fort Lauderdale Division**

**Case No: ________________**

**Jury Trial Requested**

NEXO INC.,

Plaintiff,

vs.

FORREST GILMAN,

Defendant.

___________________________________

# PLAINTIFF'S ORIGINAL COMPLAINT

## NATURE OF THE ACTION

1. This is an action for fraud, constructive fraud, and securities fraud arising from Defendant Forrest Gilman's scheme to induce Plaintiff Nexo Inc. ("**Plaintiff**" or "**Nexo**") to invest approximately $5 million in the common stock of non-party Mode Eleven Bancorp f/k/a Hulett Bancorp ("**Bancorp**"), a Wyoming bank holding company. Defendant Forrest Gilman ("**Defendant**" or "**Gilman**") personally orchestrated Nexo's $5 million investment in Bancorp—at an implied valuation of approximately $100 million—based on a series of false statements, material omissions, and misleading half-truths. Gilman also caused Nexo to suffer additional and separate losses—including lost time, lost manpower, substantial out-of-pocket costs, diverted attention, and wasted resources—due to Gilman's fraud.

2. Gilman pitched Nexo on a purported "FinTech business plan" under which Bancorp's wholly owned subsidiary, Summit National Bank ("**SNB**"), would pivot from its

traditional agricultural and community banking activities and transform into a banking-as-a-service and crypto-as-a-service platform for strategic partners such as Nexo.

3. Gilman represented that SNB was properly licensed, had the regulatory expertise and local management necessary to execute the FinTech strategy, and had already received, or was virtually assured of receiving, regulatory approval for the contemplated business model—even as federal banking regulators were issuing contemporaneous guidance indicating that such approval for a small rural bank was highly unlikely, unbeknownst to Nexo.

4. Gilman further represented that Nexo's $5 million capital infusion would be used to implement the FinTech business plan and would be sufficient to do so, and that other investors were participating in the same February 2022 funding round at the same price per share as Nexo. Those representations were false.

5. In reality, Bancorp had recently sold stock to other investors at a fraction of the price charged to Nexo—$1,000 per share in 2021 and approximately $633 per share in 2022—and was later prepared to raise additional capital at just $89 per share. Nexo was the only participant in the February 2022 round at the $4,720 per-share valuation. Nexo's funds were not used to implement the FinTech business plan, as Gilman had represented, but were diverted to support Bancorp's capital position and daily operations as it struggled to remain solvent.

6. Throughout the parties' multi-year discussions, Gilman concealed Bancorp's precarious financial condition, internal shareholder disputes, and regulatory headwinds, while internally advising Bancorp's Board that the proposed partnership with Nexo was problematic and should be abandoned—all contrary to his outward assurances to Nexo that the relationship was progressing. Nexo did not discover the truth until, among other developments, Bancorp announced in February 2024 that it had decided to "shutter the fintech business," and federal banking

regulators subsequently issued a cease-and-desist order and a consent order identifying serious compliance deficiencies.

7. As a result of Gilman's misconduct, Nexo's $5 million equity investment in Bancorp has been decimated, and Nexo suffered other substantial out-of-pocket losses related to its multi-year pursuit of both an investment and business relationship with Bancorp and SNB. This relationship was doomed from the beginning due to Gilman's fraud. Nexo now brings this action solely against Gilman in his individual capacity to recover its substantial losses.

## PARTIES AND JURISDICTION

8. Plaintiff Nexo is an international cryptocurrency platform that began operations in 2018 and provides a variety of services to its customers around the globe, including extending credit lines secured by cryptocurrency collateral. Nexo is a foreign corporation, incorporated under the laws of the Cayman Islands and with its principal place of business in the Cayman Islands.

9. Defendant Gilman is an individual and, on information and belief, a citizen and resident of Fort Lauderdale, Florida.

10. Defendant Gilman is the former Chairman of the Board and President of non-party Bancorp. Gilman ceased being the Chairman of the Board and President of Bancorp in December 2023, and ceased being a board member in March 2024. On information and belief, after March 2024 and through the present, Defendant was not employed by Bancorp in any capacity, did not serve as a board member of Bancorp in any capacity.

11. As set forth in greater detail below, the amount in controversy in this lawsuit exceeds $75,000, exclusive of interest and costs.

12. Accordingly, this Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.

13. Venue is proper in this District and Division under 28 U.S.C. § 1391(b)(1) because, on information and belief, Defendant Gilman resides in this District and Division.

14. Defendant Gilman is subject to personal jurisdiction in this Court because he is a citizen and resident of Florida and resides in this District.

## FACTUAL ALLEGATIONS

### *Nexo Explores FinTech Opportunities and Gilman's Early Misrepresentations*

15. In 2019 and thereafter, Nexo started exploring various business opportunities around the world with the goal to acquire a stake in a bank and create strategic synergies to help transform it into a leading FinTech banking partner.

16. Nexo identified SNB—Bancorp's wholly-owned subsidiary—as a promising partner bank in the U.S. and began discussions with Gilman, who was then Bancorp's Chairman of the Board and President.

17. Nexo's team, including Kalin Metodiev, initiated discussions with Gilman in November/December 2019 and proceeded to establish regular weekly calls in Q1 of 2020 in order to develop the opportunity in the fastest possible way. From the very beginning, Nexo's team expressed clearly that its priority would be the strategic collaboration, whereas an investment in the bank would also be desired to be achieved in parallel.

18. Gilman represented to Nexo that he had professional experience with banking regulatory matters from previous positions at Wall Street banks.

19. According to Gilman, SNB intended to pivot away from its historical agricultural loan and community banking business and transition to a banking-as-a-service ("**BaaS**") and crypto-as-a-service ("**CaaS**") model, thereby creating a platform for strategic partnerships with FinTech providers, such as Nexo.

20. Gilman represented that SNB was properly licensed and could exclusively handle the regulatory requirements of the relationship, while Nexo could provide the financial, technical, and operational expertise necessary to execute the new FinTech business plan.

21. Gilman stated that SNB was intimately familiar with the U.S. banking landscape and the regulatory requirements associated with the proposed FinTech partnership.

22. Gilman claimed that SNB possessed a local and experienced management team that could tend to all regulatory requirements while the bank provided BaaS and CaaS services in collaboration with Nexo.

23. Under this new business plan, SNB would create a BaaS and CaaS platform that would provide the infrastructure necessary to partner with Nexo and offer innovative financial products to SNB's customers ("FinTech business plan").

***Nexo's February 2022 Investment at an Inflated Valuation***

24. Nexo was engaged in regular discussions with Gilman from late 2019 through February 2022. During that period of time, Gilman repeatedly represented that in order to expedite the development of the FinTech business plan, SNB would require a capital infusion to fund the project and solicited such contribution from Nexo.

25. Nexo was amenable to a tentative investment of up to $5 million, but insisted that any funds from its possible future investment would be directed towards these strategic priorities.

26. Gilman told Nexo that its proposed investment would be used for those purposes and would be sufficient to implement the FinTech business plan.

27. Based on Gilman's false representations, on February 1, 2022, Nexo executed a Subscription Agreement ("**SA**") with Bancorp for the purchase of 1,060 shares of Bancorp's voting

common stock, at the grossly inflated valuation of $4,720 per share, for a total purchase price of $5,003,200.

28. The purchase price of Nexo's shares implied a market valuation of Bancorp of approximately $100 million as of February 2022.

29. Gilman's misrepresentations fraudulently induced Nexo to execute the SA and invest in Bancorp at a grossly inflated price.

30. Both before and after Nexo's share purchase in February 2022, Bancorp sold its common stock at a fraction of the price that Bancorp sold to Nexo.

31. Based on Gilman's false representations, on February 8, 2022, Nexo also executed a Strategic Relationship Agreement ("**SRA**") with Bancorp, which detailed Nexo's planned business relationship with Bancorp and SNB, separate and apart from Nexo's $5 million equity investment in Bancorp. Among other things, the SRA imposed a binding good faith negotiation requirement on Bancorp and SNB to negotiate the terms of definitive agreements related to the strategic business relationship described in the SRA. Nexo invested time, effort and resources in connection with its pursuit of this separate business relationship, and Nexo suffered losses separate from its equity investment due to Gilman's fraud.

32. Gilman's representations fraudulently induced Nexo to execute the SRA and to incur substantial out-of-pocket costs associated with pursuit of a purported business relationship that was impossible to achieve at the time the SRA was executed due to Gilman's fraud.

33. At the time Gilman executed the SRA, he had a preconceived and undisclosed intention of not performing the good faith negotiation obligation of the contract, and of not pursuing the business relationship described in that agreement.

34. As detailed herein, Gilman also made misrepresentations of facts collateral to the SRA (though it induced Nexo to sign the SRA), including misrepresentations that Nexo's separate equity investment was being used to implement the FinTech business plan, that Nexo's equity investment would be sufficient to finish implementation of the FinTech business plan, that the bank had already made substantial progress in implementing the FinTech business plan (from both an operational and regulatory perspective) at the time the SRA was executed, and that implementation of the FinTech business plan would allow Nexo to become a business partner of the bank, not merely an equity holder. None of these representations were true.

35. Gilman executed the SA on behalf of Bancorp, and Gilman executed the SRA on behalf of both Bancorp and SNB.

36. Between December 2020 and June 2021, Gilman was continuously explaining that Nexo could not proceed with the investment before federal regulators had provided a formal approval of some existing shareholders disposing of their shares. In June 2021, Gilman notified Nexo that the administrative approval had been granted and Gilman committed to prepare an indicative term sheet for Nexo's investment. Instead of admitting Nexo to invest in June 2021 offering at an $18 million valuation (which Nexo first learned about after Nexo's investment was completed), Gilman procrastinated with the provision of the investment documents until November 2021.

37. Documents filed with federal regulators reflect that, in 2022, Bancorp sold 4,216 shares for total proceeds of approximately $7 million.

38. In May 2021, Bancorp completed a funding round with an offering price of only $1,000 per share, implying a market valuation of only $18 million.

39. Neither Gilman nor anyone else at Bancorp offered Nexo the opportunity to participate in the May 2021 funding round.

40. Bancorp's May 2021 offering set a stock price that was 79% less than the price offered to Nexo in its February 2022 offering only eight (8) months later.

41. Both the May 2021 and February 2022 offering documents touted the same FinTech business plan involving digital assets and partnerships with blockchain-related businesses like Nexo. The only difference between the two offerings was that Bancorp charged Nexo nearly five (5) times the amount for the same shares.

42. To Nexo's knowledge, no material progress was made on implementation of the FinTech business plan Gilman previously pitched to Nexo between May 2021 and February 2022.

43. Bancorp sold 3,156 additional shares in 2022 with proceeds of only $2 million, implying an average per-share price of $633—again, a fraction of what Nexo paid. [1]

44. Thus, Bancorp sold at $1,000 per share to investors in 2021, $4,720 per share to Nexo in 2022, and then $633 per share to other investors *the same year Nexo purchased Bancorp's shares*—2022.

45. Most recently, in December 2024, Nexo received offering materials proposing a new capital raise of between $10 million and $20 million, with an offering price of only $89 per share. Bancorp's December 2024 offering set a stock price that was 98% less than the price offered to Nexo in the February 2022 offering. The December 2024 offering implies that Nexo's $5 million investment in Bancorp is now worth only $94,340.

---

[1] Bancorp's 2022 financial statements filed with the Federal Reserve Board disclose the sale of 4,216 shares of common stock for $7,003,000 in proceeds. Nexo purchased 1,060 of those shares for $5,003,000 in proceeds. Ignoring Nexo's shares and proceeds, Bancorp sold the remaining 3,156 shares to other investors for $2,000,000.

***Gilman's Repeated Representations to Nexo Are Proven False by Bancorp's Internal Records***

46. Nexo was the victim of fraud perpetrated by Defendant Gilman.

47. Gilman made the false statement that Bancorp's regulators had preliminarily approved the Fintech business plan and were likely to grant final approval, when those same regulators were issuing contemporaneous guidance that the chance of approval was virtually nil.[2]

48. On information and belief, Gilman was aware of this regulatory guidance but persisted in making representations to Nexo regarding the likelihood of approval that were inconsistent with that guidance.

49. Gilman made the false promise that Bancorp would use the proceeds of Nexo's investment to implement the Fintech business plan touted in the offering materials.

50. Gilman made the false promise that SNB possessed the appropriate licenses and governmental approvals to pursue the BaaS and Fintech business plan touted in the offering materials.

51. Gilman made the false promise that Nexo's proposed $5 million investment would be sufficient to implement the Fintech business plan touted in the offering materials.

52. Gilman made the false promise that other investors were participating in the same February 2022 funding round at the same price per share that Nexo was paying, when in fact Nexo was the only participant in the February 2022 funding round. Gilman made this false statement to

[2] *See, e.g.,* OCC, Interpretive Letter #1179, Chief Counsel's Interpretation Clarifying Authority of a Bank to Engage in Certain Cryptocurrency Activities (November 18, 2021) (OCC-regulated banks may not engage in cryptocurrency activities until they receive written notification of the supervisory' s office's non-objection, and describing stringent and onerous standard necessary to obtain non-objection); Acting Comptroller Michael J. Hsu, Remarks before the Federal Reserve bank of Philadelphia Fifth Annual Fintech Conference, "Modernizing the Financial Regulatory Perimeter" (November 16, 2021) ("The message from both [OCC and federal banking agencies] is that the agencies are approaching crypto activities very carefully and with a high degree of caution. We expect banks to do the same.")

Nexo shortly before Nexo's investment in February 2022. Nexo's team argued about the excessively rich valuation, and Gilman told Nexo this was the set uniform price for all participants in this round and Nexo could not be offered a different valuation despite the substantial strategic value to be contributed by Nexo. It turned out later that Nexo had been horribly cheated, as there was no other participant in the February 2022 offering. No other investor has ever invested at a valuation higher than $18 million, which had been the last valuation a mere 7-8 months before Nexo invested.

53. Gilman made the false promise that Bancorp would comply with the good faith negotiation provision of the SRA, and that Bancorp and SNB would execute definitive agreements memorializing their business relationship with Nexo as described in the SRA, when Gilman had the preconceived and undisclosed intention of not performing the SRA at the time its was executed.

54. Nexo would never have made the $5 million investment in Bancorp, would never have executed the SRA and the SA, and would never have incurred the substantial out-of-pocket costs of pursuing a business relationship with Bancorp and SNB, but for Gilman's false representations.

55. Nexo's investment was not used to pursue the Fintech business plan as represented by Gilman before execution of the SA. Instead, Nexo's investment was diverted to support the bank's capital position and daily operational needs.

56. At no point did Bancorp seek to collaborate with Nexo as represented by Gilman before execution of the SA, making it clear that Gilman never seriously intended to collaborate with Nexo to implement the Fintech business plan.

57. Indeed, contrary to Gilman's prior representations to Nexo, in a letter to shareholders dated February 2, 2024, Bancorp first disclosed to Nexo that it "has undertaken a

comprehensive transition to step back from the fintech business" and further that it has made the "decision to shutter the fintech business."

58. Moreover, during the time it was negotiating with SNB, the bank was suffering from a series of concealed operational and financial crises, as well as shareholder revolts and Board control battles, with Gilman desperate to gain control of Bancorp and keep SNB solvent through any means necessary.

59. Unknown to Nexo, Gilman intended to use Nexo's investment to support Bancorp's daily operational needs, not to implement the Fintech business plan as discussed.

60. Bancorp's May 19, 2020 minutes explained that "Nexo is another potential investor. They are interested in a strategic partnership and perhaps an investment. Their customers would also make deposits at the Bank. Nexo provided a detailed business plan." It further stated that all investors, including Nexo "want to see the holding company's strategic plan before moving forward."

61. While Gilman was telling Nexo the partnership was moving forward, he was telling the Board the opposite. Bancorp's November 17, 2020 minutes stated that "Forrest recommends the Bank walk away from this proposed partnership" with Nexo. Gilman told the Board that Nexo's "business model is problematic," and another director "indicated that it would be a challenge to do business with Nexo."

62. Despite these statements by Bancorp that it did not intend to actually partner with Nexo as of November 2020, Gilman continued to feign a good faith negotiation posture with Nexo through execution of the SA in February 2022.

63. The November 2020 minutes support a strong inference of fraud, which supports the conclusion that Gilman had a preconceived and undisclosed intention of not performing the SRA when it was executed on February 8, 2022.

64. Nexo understands that, in addition to giving Gilman control over the Board, the May 2021 offering bought out old shareholders and brought in new shareholders at $1,000/share.

65. While the May 2021 offering documents described the same FinTech business plan that Gilman had been pitching to Nexo for over a year, Nexo was not given an opportunity to invest at the $1,000 per share, $18 million valuation.

66. Instead, Gilman strung Nexo along and induced Nexo to invest in a valuation five (5) times that amount only eight (8) months later. This was part of Gilman's scheme to finance the bank's daily operations with Nexo's $5 million investment on the false pretense that the funds would be used to finalize implementation of the FinTech business plan.

67. Between December 2020 and June 2021, Gilman was continuously explaining that Nexo could not proceed with the investment until regulators had approved of then-existing shareholders disposing of their shares. Instead of allowing Nexo to invest in May/June 2021 at $18 million, however, Gilman delayed the provision of the investment documents to Nexo until November 2021 based on the false representation that regulatory approvals prevented an earlier investment by Nexo.

68. In September 2021, SNB distributed an investor presentation that described how the bank planned "to offer FinTechs and other embedded financial services providers with a robust, accessible banking solution. Using our platform solution, FinTechs would be able to develop and deliver a broad range of banking products that Summit can offer using a single, tech friendly API centric platform."

69. SNB was using the FinTech business plan as a basis to solicit new investment despite red-flag statements from the Office of the Comptroller of Currency ("**OCC**") in late 2021 that there was almost no chance that the OCC, at that time, would give final approval to a small rural bank to pursue such a plan.

70. In February 2022, Nexo subscribed for $5 million at a valuation of $100 million. Nexo's team complained about the excessive valuation and were told by Gilman that *this was the set uniform price for all participants in this round* and Nexo could not be offered a different valuation despite the substantial strategic value Nexo brought to the table. This statement was false—there was no other participant in the February 2022 offering.

71. No other investor besides Nexo has ever invested in Bancorp at a valuation higher than $1,000 per share.

72. The parent company financial statements for 2021, 2022, and 2023 filed by Bancorp with the Federal Reserve Board[3] report that the company issued new common stock in each of those years. The reported figures show that Nexo's purchase price for the shares was a gross aberration from the other sales:

| **Year** | **Common Stock Issued**<br><br>**(Excluding Stock Sold to Nexo in 2022)** | **Proceeds from Issuance**<br><br>**(Excluding Proceeds from Nexo in 2022)** | **Average Proceeds Per Share**<br><br>**(Excluding Proceeds from Nexo in 2022)** |
|---|---|---|---|
| 2021 | 3,724 | $3,724,000 | $1,000 |
| 2022 | 3,156 | $2,000,000 | $633 |
| 2023 | 18,577 | $8,441,000 | $454 |
| 2024 | *none reported* | *n/a* | *n/a* |
| 2025 | TBD | $10,000,000 to $20,000,000 target | $89 |

[3] The reports are available at: https://www.ffiec.gov/npw/Institution/Profile/3402511?dt=20241113.

73. Gilman fraudulently concealed information, made misleading partial disclosures to Nexo, and slowed the pace of discussions because during the time he was negotiating with Nexo, he was also attempting to consolidate his control over Bancorp, buy-out existing investors, maximize Nexo's investment by depriving Nexo of the ability to participate in earlier funding rounds at a much lower valuation, use Nexo's inflated investment to plug operating deficits, and hide Bancorp's desperate financial situation.

74. SNB is a wholly owned subsidiary of Bancorp, a bank holding company, and SNB is Bancorp's primary asset. As a bank holding company, Bancorp regularly "downstreamed" funds to SNB, including the proceeds of equity investments in Bancorp, if necessary to keep SNB solvent and maintain capital requirements above minimum thresholds required by the OCC and/or other banking regulators.

75. At no point prior to Nexo's investment had there been any disclosure from Gilman (or Bancorp) that SNB was in a desperate financial situation and dependent on outside funding to stay solvent. If Gilman (and/or Bancorp) had not fraudulently concealed this information, Nexo would have learned that its $5 million investment would be channeled towards plugging SNB's various operating deficits, not implementing the FinTech business plan.

76. On February 2, 2024, Nexo received investor correspondence from John Miller, the new CEO of Bancorp who replaced Gilman, that SNB would "shutter the fintech business." Nexo did not discover the facts constituting the fraud until after this disclosure.

***Bancorp Files for Bankruptcy***

77. On March 28, 2024, the Board of Governors of the Federal Reserve System issues an order to cease and desist upon consent (the "**C&D Order**") pursuant to the Federal Deposit Insurance Act. The C&D Order stated, among other things, that "Bancorp shall not engage in any

expansionary activities related to the fintech business strategy, including the establishment of any new subsidiaries, business lines, products, programs, services, customers, or program managers in connection with the fintech business strategy, without the prior written approval of the Reserve Bank."

78. On June 4, 2024, the OCC issued a consent order for unsafe or unsound practices and deficiencies in the Bank Secrecy Act/Anti-Money Laundering ("**BSA/AML**") compliance program which resulted in violations of law, rule, or regulation, including a 12 C.F.R. § 21.21 BSA/AML program violation.

79. In December 2024, Nexo received the new offering documents offering the shares at $89—a 98% discount to Nexo's $4,720 purchase price.

80. On March 10, 2025, Nexo sent a demand letter to Bancorp, which stated that Bancorp and Gilman committed fraud and demanded the redemption of Nexo's equity interest in Bancorp and return of Nexo's $5 million investment, among other things.

81. On June 9, 2025, Bancorp filed for bankruptcy under Chapter 11, Subchapter V of the Bankruptcy Code.

82. Through this civil action, Plaintiff seeks relief against Gilman in his individual capacity only and does not seek relief against Bancorp or SNB.

83. On December 9, 2025, the bankruptcy court presiding over the Bancorp bankruptcy proceeding entered an order granting Nexo's motion to confirm absence of the automatic stay or, in the alternative, relief from the automatic stay ("**Order**"). *In re: Mode Eleven Bancorp*, Case No. 25-20240, Dkt. 233 (Dec. 9, 2025) (Bankr. D. Wyo.).

84. The Order stated that "The Court confirms that the automatic stay of 11 U.S.C. § 362(a) does not apply to claims to be asserted individually against nondebtor Forrest Gilman, the

Debtor Mode Eleven Bancorp's former Chairman of the Board and President, to be brought in the United States District Court for the Southern District of Florida, Fort Lauderdale Division, or in any other appropriate forum."

## CLAIMS FOR RELIEF

### COUNT I
### Fraud

85. The allegations set forth in paragraphs 1 through 83 are incorporated by reference as if fully realleged herein.

86. Defendant Gilman made false statements of material fact to Plaintiff, as described in detail in paragraphs 15 through 83.

87. Defendant Gilman made those false statements with intent to deceive Plaintiff, or with reckless indifference to the truthfulness of those statements.

88. Plaintiff Nexo reasonably relief on those false statements to its detriment.

89. Plaintiff Nexo suffered damages as a result of Defendant Gilman's fraud.

90. Defendant Gilman is liable for compensatory damages due to his fraud.

91. Defendant Gilman is liable for punitive damages due to his fraud because Defendant Gilman was personally guilty of intentional misconduct, and that misconduct was fraudulent, malicious, and/or deliberately oppressive, as described in paragraphs 15 through 83.

### COUNT II
### Constructive Fraud

92. The allegations set forth in paragraphs 1 through 83 are incorporated by reference as if fully realleged herein.

93. Defendant Gilman made a series of fraudulent omissions to Plaintiff, and partial disclosures, that caused his statements to be constructively fraudulent and misleading, as described in detail in paragraphs 15 through 83.

94. Defendant Gilman's omissions and partial disclosures failed to state one or more material facts necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading.

95. Defendant Gilman engaged in constructive fraud with intent to deceive Plaintiff Nexo, or with reckless indifference to the truthfulness of those statements.

96. Plaintiff Nexo reasonably relied on those constructively fraudulent statements to its detriment.

97. Plaintiff Nexo suffered damages as a result of Defendant Gilman's constructive fraud.

98. Defendant Gilman is liable for compensatory damages due to his constructive fraud.

99. Defendant Gilman is liable for punitive damages due to his constructive fraud because Defendant Gilman was personally guilty of intentional misconduct, and that misconduct was fraudulent, malicious, and/or deliberately oppressive, as described in paragraphs 15 through 83.

**COUNT III**
**Civil Liability for Securities Fraud under Wyoming Statutes § 17-4-509(b)**

100. The allegations set forth in paragraphs 1 through 83 are incorporated by reference as if fully realleged herein.

101. Defendant Gilman made false statements of material fact to Plaintiff, as described in paragraphs 15 through 83.

102. Plaintiff Nexo asserts a civil claim for securities fraud against Defendant Gilman under Wyoming Statutes § 17-4-509(b).

103. During the relevant time period, the securities fraud occurred in Wyoming while Gilman was serving as the President and Chairman of the Board of Bancorp, a Wyoming bank holding company.

104. As described above, Plaintiff Nexo purchased securities of Bancorp consisting of common stock for a purchase price of approximately $5 million.

105. Defendant Gilman is liable to Plaintiff Nexo because he sold securities in Bancorp to Nexo by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which it is made, not misleading.

106. Plaintiff did not know the untruth or omission.

107. Plaintiff suffered damages as a result of Defendant Gilman's conduct.

108. Defendant Gilman is personally liable under Section 17-4-509(g)(i) because he directly or indirectly controlled Bancorp during the relevant time period.

109. Defendant Gilman is personally liable under Section 17-4-509(g)(ii) because he was the CEO and a director of Bancorp during the relevant time period.

110. Defendant Gilman is personally liable under Section 17-4-509(g)(iii) because he materially aided the conduct giving rise to the liability.

111. Pursuant to Section 17-4-509(b), Plaintiff seeks to recover the consideration paid for the securities, less the amount of any income received on the securities, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorney's fees determined by the court, or for actual damages.

## REQUEST FOR PUNITIVE DAMAGES

112. Defendant Gilman's conduct, as described herein, was intentional, malicious, willful, wanton, and in reckless disregard of Plaintiff Nexo's rights.

113. Defendant Gilman's actions constituted a conscious disregard for Plaintiff's rights.

114. Punitive damages are warranted to punish Defendant Gilman for his egregious misconduct and to deter similar conduct in the future.

115. Plaintiff Nexo demands punitive damages against Defendant Gilman, in an amount determined by the trier of fact, in addition to all other damages and relief sought herein.

## REQUEST FOR JURY TRIAL

116. Plaintiff Nexo requests a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nexo demand relief against Defendant Gilman as follows:

A. For compensatory damages and costs;

B. For punitive damages;

C. For pre- and post-judgment interest;

D. For attorney's fees; and

E. For any other and further relief that the Court deems just and appropriate.

[*Signature on following page.*]

Respectfully submitted this 30th day of January, 2026.

BAKER & MCKENZIE LLP
830 Brickell Plaza, Suite 3100
Miami, Florida 33131
Phone: (305) 789-8900
Fax: (305) 789-8953

By: */s/ Benjamin Davis*
Benjamin Cody Davis, Esq.
Florida Bar No. 110734
benjamin.davis@bakermckenzie.com

Ian S. Shelton, Esq. (*Pro Hac Vice Forthcoming*)
800 Capitol Street, Suite 2100
Houston, Texas 77002
Phone: (713) 427-5000
ian.shelton@bakermckenzie.com

*Attorneys for Nexo Inc.*

**CERTIFICATE OF SERVICE**

I certify that on January 30, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: */s/ Benjamin C. Davis*
Benjamin C. Davis, Esq.